**EXHIBIT A**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| STACEY BROWN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 6:19-cv-00045 |
| | § | |
| | § | JURY TRIAL DEMANDED |
| SCOTT AND WHITE MEMORIAL | § | |
| HOSPITAL, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

## INTRODUCTION

1.       On January 19, 2018, Plaintiff Stacey Brown ("Ms. Brown") brought her four-year-old son, J.R.H., to Defendant's McLane Children's Scott and White Hospital ("Hospital" or "Defendant") for severe leg and hip pain. Shortly thereafter, J.R.H. was diagnosed with leukemia, and for the past two years, he has undergone numerous and frequent medical visits and treatments to overcome his childhood cancer.  Ms. Brown is deaf and uses American Sign Language ("ASL") to communicate complex medical information with doctors, specialists, surgeons and healthcare professionals.  For each and every inpatient and outpatient visit Ms. Brown attended with her children, she requested an ASL interpreter.  At every interaction until February 2019, Defendant refused to arrange for qualified and effective ASL interpreters and failed to ensure alternative effective means of communication for Ms. Brown to understand important medical information about her children. In addition, Defendant's nurses identified Ms. Brown as "DUMB and DEAF." On numerous occasions Defendant required Ms. Brown's 12-year-old daughter and at times, even younger children, to interpret complex medical information for Defendant. Brett Howe ("Mr.

Howe"), Ms. Brown's life partner, is not deaf and is not fluent in ASL. When he attended visits for J.R.H.'s cancer treatments and meetings with doctors, Defendant ignored Ms. Brown and made no effort to include her in the communication about their son's medical care. Because of Defendant's failure to provide its own effective interpreter for Ms. Brown, Mr. Howe was forced to relay medical information for Defendant's healthcare providers about J.R.H. to Ms. Brown, even though he is not fluent in sign language and is not a trained interpreter. The information was related to Ms. Brown's son's leukemia diagnosis, treatment, prognosis, and day-to-day health status updates. Defendant wrongfully required unqualified interpreters, including Mr. Howe and Ms. Brown's minor children, to interpret for Ms. Brown on multiple occasions.

After Ms. Brown filed her Original Complaint in February 2019 [ECF-1], Defendant continued to deny Ms. Brown's request for an ASL interpreter when her partner, Brett Howe was hospitalized and required major surgeries. Defendant also continued to deny Ms. Brown an ASL interpreter for appointments for J.R.H. on multiple occasions. Defendant barred Plaintiff from equally enjoying the benefits, services, and privileges afforded to non-disabled people or their companions, causing substantial stress and grief to a family that was already grieving a serious illness for a 4-year-old boy. Defendant's actions violate the anti-discrimination provisions of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, Section 504 of the Federal Rehabilitation Act ("Rehab Act"), 29 U.S.C. § 794, and Chapter 121 of the Texas Human Resources Code, § 121.001, *et seq*.

2.      Plaintiff requests declaratory and injunctive relief to include an order to arrange for and provide qualified and effective ASL interpreters at any and all of Defendant's programs and services Plaintiff Brown seeks to attend. Plaintiff also seeks compensatory and punitive damages permitted by law, as well as statutory attorneys' fees and expenses.

EXHIBIT A

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over Plaintiff's claims arising under the ADA, 42 U.S.C. § 12101, *et seq.*, and the Rehab Act, 29 U.S.C. § 794, pursuant to 28 U.S.C. §1331 insofar as such claims arise under the laws of the United States.  Plaintiff seeks declaratory and injunctive relief to redress the deprivation of rights secured to them by the ADA, 42 U.S.C. § 12101, *et seq.*, and the Rehab Act, 29 U.S.C. § 794.

4.      This Court has supplemental subject matter jurisdiction over the claims of the State of Texas set forth in this Complaint pursuant to 28 U.S.C. § 1367, insofar as these claims are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Plaintiff seeks declaratory and injunctive relief, and other such statutory damages to redress the deprivation of rights secured to them by Chapter 121 of the Texas Human Resources Code, § 121.001, *et seq.*

5.      Venue is proper within this District pursuant to 28 U.S.C. § 1391 because Defendant owns, operates, and/or manages Scott and White Memorial Hospital, which maintains its principal place of business in this District,  and a substantial part of the events, omissions, and injuries giving rise to the claims alleged in this Complaint occurred in this District.

## PARTIES

6.      Plaintiff Brown and Brett Howe are domestic partners with seven children who are Texas residents residing in Hewitt, Texas, a 30-minute drive one-way to Defendant's Waco hospitals and clinics.

7.      Defendant is a Texas corporation with its registered offices located at 1999 Bryan Street, Suite 900, Dallas, Texas, maintaining its principle place of business in Waco, Texas, and doing business in the State of Texas.

3

8.     Defendant is a healthcare facility and receives federal funding by participating in Medicare and Medicaid and is a place of public accommodation.

## FACTS

9.     Plaintiff Stacey Brown is a person with a disability as that term is defined and used by the ADA, Rehab Act, and the Chapter 121 of the Texas Human Resources Code, § 121.002(4)(D).  She is deaf; has been deaf since birth; and is the mother of J.R.H.

10.     Ms. Brown's primary language for receptive and expressive communication is ASL. Though she has English language skills, she requires qualified ASL interpreters to effectively communicate complex medical information with hearing people in medical settings.

11.      Brett Howe is the domestic partner of Ms. Brown.

12.     Mr. Howe is not deaf.  He does not communicate proficiently in ASL.  He is not a trained or qualified medical sign language interpreter and is not trained in medical terminology.

13.     Mr. Howe is a companion of a person with a disability as defined by the ADA and Rehab Act.

14.     At all times relevant to this Complaint, Defendant knew that Plaintiff Brown was deaf and relied on sign language interpreters for communication.

15.     Defendant knew that Mr. Howe was not a qualified ASL interpreter since at least January 2011.

16.     At all times relevant to the facts of this Complaint, Defendant's healthcare providers including doctors, nurses and its administration were acting as agents of Defendant.

**A.     Defendant's History and Pattern of Denying Plaintiff Brown Communication Access for Appointments and Emergency Department Visits With Her Children**

17.     Ms. Brown has been a patient at Defendant since her birth in 1982 and has always requested sign language interpreters for communication access at Defendant.

**EXHIBIT A**

18.    Ms. Brown delivered her first child at Defendant on October 27, 2004.  At this delivery, Defendant secured a professional interpreter named Ida Flanary.

19.    On November 28, 2005, Ms. Brown gave birth to her second child, J.H. B-P. Defendant also provided and paid for a professional interpreter, Ida Flanary, for this labor and delivery.

20.    On October 3, 2008, Ms. Brown gave birth to her third child.  Defendant failed to provide an interpreter for labor and delivery and subsequent check-ups at that time.

21.    On May 3, 2011, Ms. Brown gave birth to her fourth child, at a different hospital. Defendant failed to provide an interpreter at its location for all pediatric care and well-child visits.

22.    On April 25, 2012, Ms. Brown gave birth her fifth child.  Defendant failed to provide an interpreter for labor and delivery and subsequent check-ups at that time.

23.    On February 11, 2014, Ms. Brown gave birth to her sixth child, J.R.H.  Defendant failed to provide an interpreter for labor and delivery and subsequent check-ups at that time.

24.    On November 11, 2016, Ms. Brown gave birth to her seventh child.  Defendant failed to provide an interpreter for labor and delivery and subsequent check-ups at that time.

25.    At each and every labor and delivery, Ms. Brown told Defendant she was deaf and required ASL interpreters to communicate with providers.  Defendant refused to secure qualified ASL interpreters despite her repeated requests.

26.    Ms. Brown continues to return to Defendant because it is the closest hospital of its size and specialty to her home.

27.    At each and every birth at the Hospital from 2011 to 2016 when no interpreter was provided, Defendant required Mr. Howe to communicate complex medical information to Ms. Brown.

28.    From 2004 to present, Ms. Brown sought medical care for her children in both emergency and prescheduled situations at Defendant.

29.    For prescheduled appointments with her children's pediatricians, Ms. Brown called in advance to Defendant's appointment phone line to request a qualified sign language interpreter.

30.    At all times when she placed the request, the appointment scheduler confirmed her request for an interpreter and told her that a qualified interpreter would be requested.

31.    Despite the confirmation from Defendant's scheduling staff, Defendant did not provide a qualified interpreter for Ms. Brown at any pediatric clinic visits for her children.

32.    Defendant would either rely on Ms. Brown's children to relay information or use limited and brief note writing or text message to communicate with Ms. Brown.

33.    Defendant blatantly, knowingly, and routinely failed to fully include Plaintiff Brown in the care of her children at prescheduled visits.

34.    In addition to prescheduled appointments, Ms. Brown accompanies her children to Defendant's Emergency Department ("ED") for emergency care and treatment.

35.    At each and every ED visit, Defendant refused to contact an onsite interpreter and did not provide effective alternative communication access.

36.    At all ED visits, Defendant repeatedly required Plaintiff to rely on speech-reading[1] or would require a minor child to relay complex medical information from doctors and nurses.

37.    Ms. Brown is not an experienced or competent speech reader, and Ms. Brown did not consent to Defendant relying on her children to interpret for them.

38.    From time to time at ED visits, Defendant also required Mr. Howe to relay complex medical information about Plaintiff's children to Ms. Brown. Mr. Howe could not and cannot

_____

[1] Also known as lip-reading.

6

accurately and comprehensively communicate all of the complex emergency medical information to Ms. Brown.

39.    Defendant blatantly, knowingly, and routinely failed to include Plaintiff Brown in the care of Plaintiff's children at the ED.

40.    As a result of Defendant's actions and its intentional failure to provide effective communication, Ms. Brown was deprived of the full and equal use of, and benefit from, the programs, services, and benefits of Defendant, which Defendant provides to non-disabled patients and disabled companions of patients.

41.    As a further result of Defendant's actions, and their failures to act, Plaintiff suffered, and continues to suffer, emotional injuries, including but not limited to, humiliation, embarrassment, frustration, anxiety, grief and despair.

**B.    On January 19-28, 2018, Defendant Further Denies Plaintiff Effective Communication Access and Labels Her Deaf and Dumb**

42.    On January 19, 2018, at around 4:00 p.m., Plaintiff's 4-year-old son, J.R.H., was experiencing excruciating pain in his leg and hip.

43.    Ms. Brown rushed J.R.H. to the ED at Defendant and arrived at approximately 5:00 p.m.

44.    When she arrived to the ED, she immediately notified Defendant's triage nurse that she was deaf and required a qualified sign language interpreter to communicate.  She requested a professional interpreter to appear onsite as soon as possible.

45.    When Defendant began examining J.R.H., without asking for permission, Defendant's nurse and physicians told Plaintiff's 12-yr-old daughter, J.H. B.-P., to tell Ms. Brown what Defendant would do for testing and evaluating J.R.H.

46.     Even though Defendant had several hours to secure an onsite interpreter, throughout the evening, overnight and through the next morning of January 20th, Defendant's doctors and nurses repeatedly required J.H. B-P to interpret for them, even going so far as to wake her up from sleeping to interpret for Defendant to Ms. Brown.

47.     In addition, even though Defendant had immediate access to Video Remote Interpreting ("VRI") technology,[2] Defendant did not attempt to set up or offer Ms. Brown VRI as an alternative to relying on her 12-yr-old daughter.

48.     Defendant ran multiple tests on J.R.H. over a period of eight hours.  Defendant did not communicate to Ms. Brown the purpose of the tests, what the tests would reveal, the results of the tests, or the possible reasons why J.R.H. was experiencing severe pain.

49.     On the morning of January 20, 2018, Defendant relied on Plaintiff's 12-yr-old daughter to tell Ms. Brown that J.R.H. likely had leukemia and needed to be admitted to the Hospital.  Ms. Brown observed that it was difficult and emotionally traumatic on J.H. B-P to be forced to interpret this delicate, shocking, and complex information about childhood cancer.

50.     Exhausted from interpreting all night for Defendant, family members took J.H. B-P home and Ms. Brown stayed alone with J.R.H.

51.     Later in the morning of January 20, 2018, Defendant's agents noticed there were no family members to interpret, and for the first time, they offered Ms. Brown VRI.  The attending physician attempted to rely on the VRI, but it was choppy and picture froze so frequently that Defendant turned it off and stopped using it.

---

[2] Video Remote Interpreting is a video telecommunication service that uses web cameras or videophones to provide on-demand interpreting services to deaf individuals using a remote interpreter.

52.    While the attending physician was in the room struggling with the VRI technology, a nurse came in and wrote in large bold print "Mother is Dumb & Deaf." as pictured below:



53.    Ms. Brown had just recently learned that J.R.H. was facing a potential cancer diagnosis. Shortly thereafter she read the painfully offensive statement "Mother is Dumb and Deaf." The nurse's description of Ms. Brown caused Ms. Brown to experience extreme humiliation, grief, and despair.

54.    When Ms. Brown asked the nurse why she wrote that statement, the nurse replied "Because you are!"

55.    Ms. Brown called Mr. Howe who then explained to Defendant's nurse that it is extremely inappropriate and disrespectful to call J.R.H.'s mother "Dumb."

56.     The nurse angrily erased the words and wrote "Mother is Hearing Impaired" and stormed out of the room.

57.     Ms. Brown reaffirmed her request for a sign language interpreter to the head nurse so that she could understand communications from J.R.H.'s oncologist, pediatrician, and other providers. Defendant did not call for an onsite interpreter despite this repeated request.

58.     On January 22, 2018, an administrator documented Ms. Brown's complaint about the improper labeling of Ms. Brown as "Dumb" and for the lack of ASL interpreter access the past several days at Defendant for J.R.H.'s treatment.

59.     When attempting to communicate with Ms. Brown, the administrator tried to use Defendant's VRI technology.  It did not work.  The administrator restarted the VRI system six times.

60.     The VRI technology failed, and the administrator told Ms. Brown that she would ensure an onsite interpreter is secured for Ms. Brown for the rest of J.R.H.'s inpatient treatment. Defendant did not secure an onsite interpreter for the entire inpatient treatment for J.R.H.

61.     On January 24, 2018, J.R.H. had to undergo the surgical procedure of inserting a port into his chest for future chemotherapy treatments.

62.     Defendant did not secure an interpreter to communicate with Ms. Brown about J.R.H.'s all-day procedure and post-surgery updates.

63.     Ms. Brown contacted a certified ASL interpreter that would be willing to volunteer to interpret for Defendant when it operated on J.R.H.  Defendant's agents relied on the volunteer certified interpreter to communicate with Ms. Brown about J.R.H.'s procedure and post-op care. Defendant did not offer to remit payment to the interpreter for her services.

64.     Between January 19-28, 2018, multiple physicians performed daily rounds to visit J.R.H. and to discuss J.R.H.'s condition, diagnosis, prognosis, test results and updates on his treatment plan.

65.     Although Ms. Brown was physically present, Defendant never secured a qualified interpreter to explain the above information.

66.     Defendant did not treat Ms. Brown as an essential part of J.R.H's care team.

67.     Defendant did not freely and fully share knowledge and information directly with Ms. Brown.

68.     Defendant did not provide Ms. Brown with any written materials to describe the test procedures, the treatments J.R.H. was receiving, written updates on his health, or any other medical information in the form of a document or writing.

69.     At no time from January 19-28th did Defendant offer to write with Ms. Brown on pen and paper or via text message.

70.     Defendant blatantly, knowingly, and routinely failed to include Ms. Brown in the care of her son, J.R.H., while he was in its Hospital January 19-28, 2018.

71.     Defendant relied on Mr. Howe to provide information regarding J.R.H.'s care and updates on his status day to day.  Mr. Howe could not communicate complex medical concepts or interpret up to speed with the doctor's speed of talking.

72.     Mr. Howe could not comprehend the new information he was taking in as a father and also simultaneously communicate complex medical information to Ms. Brown in the basic sign language ability he possesses.

73.     As a result of Defendant's actions and their intentional and deliberate failure to provide effective communication, Ms. Brown was deprived of qualified interpreters and both

11

Plaintiff was deprived of the full and equal use of, and benefit from, the programs, services, and benefits that Defendant provides to non-disabled patients and parents of patients.

74.    As a further result of Defendant's actions, and/or its failures to act during the week of January 19-28, 2018, Ms. Brown suffered, and continues to suffer, emotional injuries, including but not limited to, humiliation, embarrassment, anxiety, and despair.

**C.    J.R.H.'s Subsequent Visits for Chemotherapy Treatment and Care**

75.    On or about February 12, 2018, Defendant's Oncologist, Dr. Kane met with Plaintiff to confirm J.R.H.'s leukemia diagnosis and to establish a treatment plan.

76.    Defendant did not provide an interpreter or effective communication at its February 12th visit.  Defendant required Mr. Howe to communicate the treatment plan to Ms. Brown.

77.    Mr. Howe was present as J.R.H.'s father to support and calm J.R.H. during his painful lumbar puncture and tiring chemotherapy treatment.

78.    Defendant knew that Mr. Howe was not a trained or qualified sign language interpreter.

79.    Ms. Brown and Mr. Howe expressly and repeatedly notified Defendant that Mr. Howe was not a trained or qualified sign language interpreter, and that it was not appropriate to use Mr. Howe to interpret complex communications from the doctors and specialists concerning J.R.H.'s care.

80.    Defendant's reliance on Mr. Howe as an unqualified interpreter resulted in ineffective communication for Ms. Brown.

81.    Because Mr. Howe lacks ASL fluency, he could not keep up with the doctor's multiple communications and therefore, Ms. Brown could not follow in real time the information from Defendant's physicians and providers about J.R.H.'s care.

12

82.     On June 7, 2018, Dr. Kane met with Plaintiff about J.R.H.  Dr. Kane did not provide an interpreter and relied on Mr. Howe to relay information to Ms. Brown.

83.     Between the months of June through September 2018, Ms. Brown wished to attend multiple chemotherapy treatments and inpatient visits of J.R.H. Defendant would not provide ASL interpreters for Ms. Brown for any of visits.

84.     On September 27, 2018, Mr. Howe was ill and could not take J.R.H. for his day-long chemotherapy treatment.  The treatment required medication and care in three locations at the hospital.  Ms. Brown called to request an interpreter for this chemotherapy visit.

85.     When Ms. Brown arrived to the clinic on September 27th with J.R.H. for his treatment, Defendant did not secure or arrange for any effective form of communication with Ms. Brown.  Because she could not understand any communication, J.R.H.'s crucial chemotherapy treatment had to be postponed to a later date.

86.     Ms. Brown contacted patient relations shortly after September 27th to state her frustration with not having an ASL interpreter again for J.R.H.'s treatment and to emphasize her need for an ASL interpreter for all visits at Defendant for J.R.H.'s care. She did not receive any follow up from patient relations after her call.

87.     On December 6, 2018, Mr. Howe was sick and not able to take J.R.H. for his chemotherapy treatment.  Ms. Brown brought J.R.H. and her daughter, J.H. B-P to Defendant for J.R.H.'s treatment.  Defendant required J.H. B-P to interpret throughout the day for Defendant's agents.  At the end of the day, Ms. Brown asked if Defendant had VRI that was working. Defendant brought the VRI technology to Ms. Brown and Dr. Kane, but the VRI was choppy and inconsistent.

88.    Defendant blatantly, knowingly, and routinely failed to include Plaintiff Brown in the subsequent care and treatment of J.R.H. for numerous appointments with pediatricians, oncologists and other providers throughout 2018.

89.    After Ms. Brown filed her Original Complaint on February 11, 2019, Defendant began providing ASL interpreters for Ms. Brown at many of J.R.H.'s appointments and treatments.

90.    Defendant told Ms. Brown that they would not provide an ASL interpreter if she placed a request with less than 24-hours notice.

91.    On many occasions from February 2019 to present, J.R.H. required urgent medical care whereby he required treatment in less than 24 hours.  Defendant refused to attempt to secure an ASL interpreter on any occasion where Ms. Brown did not place the request with less than 24 hours notice.

92.    On September 25, 2019 Ms. Brown rushed J.R.H. to Defendant's emergency department at 8:30 a. m. and remained there for six hours while J.R.H. underwent testing and treatment.  Defendant refused to attempt to reach an ASL interpreter because Ms. Brown did not provide 24-hours notice.

93.    On September 25, 2019, Ms. Brown requested an interpreter for the next day, September 26, 2019.  Defendant refused to attempt to find an ASL interpreter for the next day because it was not exactly 24-hours notice.

94.    As a result of Defendant's actions and its deliberate failure and refusal to provide effective communication, Ms. Brown was deprived of qualified interpreters and deprived of the full and equal use of, and benefit from, the programs, services, and benefits that Defendant provides to non-disabled companions.

D.    **Defendant's Failure to Provide Communication Access For Ms. Brown at Brett Howe's Surgeries and Appointments**

95.    Beginning in December 2018, Mr. Howe developed severe medical problems whereby he required medical care for a tumor in his bladder, liver cirrosis, fistulas, and removal of problematic hernias.

96.    Ms. Brown wished to attend Mr. Howe's clinic visits and requested ASL interpreters.  From December 2018 to July 2019, Defendant did not provide ASL interpreters for Ms. Brown when she requested communication access for Mr. Howe's inpatient or outpatient surgeries, treatment and care.

97.    Specifically, on June 24, 2019, Ms. Brown requested an ASL interpreter for communication access for Mr. Howe's surgery and post-op.  While Defendant provided an ASL interpreter for a short period of time, Defendant did not have an ASL interpreter for Ms. Brown for significant communications with Mr. Howe's attending physician.

98.    Again on July 30, 2019, Defendant did not secure an ASL interpreter to be present at 5:30 a.m. for Mr. Howe's surgery.  Ms. Brown did not understand any of the communications among the physicians and healthcare providers for the pre-op before Mr. Howe's surgery.

99.    Mr. Howe remained in the hospital for four days.  Ms. Brown requested an ASL interpreter to communicate with doctors and nurses about Mr. Howe's progress, prognosis, and how to care for Mr. Howe after his discharge.  Defendant refused to provide an ASL interpreter for Ms. Brown for any of the 4 days Mr. Howe received inpatient treatment at Defendant.

E.    **Defendant's Failed Attempts to Use VRI**

100.    Defendant's VRI system did not, and still to this day, does not work.  The VRI is choppy, slow, and does not allow either Ms. Brown or the video interpreter to see and/or hear information.  The VRI picture frequently freezes, cuts out, or shuts off.

15

101. The VRI is not effective for J.R.H.'s day-long lumbar puncture treatment and chemotherapy treatment. On these days, Plaintiff and J.R.H. must stop at three different locations. He must first visit Defendant's clinic for blood tests, then go to the hospital for his lumbar puncture and recovery room, and finally, once he is recovered, the family must return to the clinic for J.R.H.'s chemotherapy treatment.

102. Even if the VRI technology could consistently maintain the upload and download speed and clarity of picture for users to hear and see from point to point (which it does not and has not been effectively able to maintain to this date), the VRI is still not an effective auxiliary aid for J.R.H.'s leukemia treatment and care.

103. The VRI interpreter cannot hear J.R.H.'s voice when he is tired and weak.

104. The VRI interpreter is always different, and cannot provide consistent context throughout the day for J.R.H.'s chemotherapy.

105. The VRI equipment cannot be rolled into all parts of the hospital and clinics where Ms. Brown requires communication with Defendant, including in areas of the hospital where there is electromagnetic radiation.

**F.   Defendant's Failure to Communicate with Ms. Brown Impacts Mr. Howe's Employment and Ms. Brown's Role as the Primary Care Taker for J.R.H.**

106. For practical and emotional reasons, Ms. Brown and Mr. Howe believed and intended that Ms. Brown would be the primary parent to accompany J.R.H. for his cancer treatments and medical visits.

107. Because Defendant repeatedly would not provide effective communication for Ms. Brown, Mr. Howe had to stop working and take over as the primary care provider for J.R.H. at the Hospital.

108.    As a result of Defendant's actions and its intentional failure to act, Ms. Brown could not actively participate at J.R.H.'s chemotherapy treatments or any office visits with Defendant's pediatricians and physicians.

109.    Ms. Brown had no other choice but to cease her primary role as J.R.H.'s caretaker and start a fulltime job to offset Mr. Howe's loss of income.

110.    In February 2019, after one year of not working, Mr. Howe had to return to work to help with the financial support of providing for a family of nine.

111.    Beginning in February 2019, Ms. Brown resumed serving as the primary healthcare agent and caretaker for J.R.H.

112.    From January 2018 to present, Defendant deprived Plaintiff of the full and equal use of, and benefit from, the programs, services, and benefits that Defendant provides to companions of non-disabled individuals.

**G.    Corrective Action As A Result of Plaintiff's Request For a Conference Prior To Filing A Temporary Restraining Order**

113.    On February 1, 2019, Plaintiff called Dr. Kane's office to request an onsite ASL interpreter for J.R.H.'s day-long chemotherapy treatment and lumbar puncture scheduled for February 7th.  Defendant would not guarantee to provide an onsite interpreter.

114.    Later on February 1, 2019, Plaintiff's counsel contacted Defendant's counsel to request a phone conference before filing a Temporary Restraining Order ("TRO") and Request for Immediate Injunctive Relief.

115.    On February 5, 2019, Plaintiff's counsel left a second message for Defendant's counsel to specifically request that it arrange for and secure an ASL interpreter for J.R.H.'s all-day treatment at Defendant scheduled for February 7th and that Plaintiff intended to file a TRO requesting the same.

116.    Later that same day, a representative from the hospital contacted Ms. Brown stating that an onsite ASL interpreter had been arranged for the February 7ᵗʰ appointment.

117.    On February 7, 2019, for the first time in an entire year of cancer treatment and care for J.R.H., Defendant secured a professional onsite ASL interpreter Ms. Brown to communicate with Defendant.

118.    With less than two full days of notice, Defendant was able to quickly and easily secure an onsite interpreter for Defendant to be able to effectively communicate with Ms. Brown.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF TITLE III OF THE ADA

119.    Plaintiff re-alleges the contents of Paragraphs 1–118 of this Amended Complaint and incorporates their contents into this Cause of Action covered by Title III of the ADA.

120.    Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).

121.    The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1)(A).  "Hearing" is a major life activity.  42 U.S.C. § 12102(2)(A).

122.    Plaintiff Brown is deaf; therefore, she qualifies as an individual with a disability as defined by 42 U.S.C. § 12102(1)(A).

123.    Defendant is a place of "public accommodation" within the meaning of the ADA. 42 U.S.C. § 12181(7)(F).

124.    Defendant violated the ADA by not affording Plaintiff an "opportunity to participate or benefit from a good, service…that is equal to that afforded to other individuals."  42 U.S.C. § 12182(b)(1)(A)(ii).

125.    Defendant violated the ADA by failing to ensure that Plaintiff was not excluded, denied services, segregated, or otherwise treated differently than other individuals because of the absence of auxiliary aids and services.  42 U.S.C. § 12182(b)(2)(A)(iii).

126.    Auxiliary services include, but are not limited to, "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments," and the "acquisition or modification of equipment or devices."  42 U.S.C. § 12103(1)(A) and (C); Et al. 28 C.F.R. § 36.303(b)(1).

127.    Defendant violated the ADA by failing to provide appropriate auxiliary aids and services necessary to ensure effective communication with Plaintiff.  28 C.F.R. § 36.303(c)(1).

128.    As a result of Defendant's violations of Plaintiff's rights under Title III of the ADA, Plaintiff suffered the harm described in this Complaint.

**SECOND CAUSE OF ACTION**
**VIOLATION OF SECTION 504 OF THE FEDERAL REHABILITATION ACT**

129.    Plaintiff re-alleges the contents of paragraphs 1–128 of this Amended Complaint and incorporate them into this Cause of Action by reference.

130.    The purpose of Section 504 of the federal Rehabilitation Act is to ensure that no "qualified individual with a disability in the United States…shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance…" 29 U.S.C. § 794(a).

131.    Plaintiff is an individual with deafness, which is a disability within the meaning of Section 504, 29 U.S.C. § 705(9)(B).

132.    Plaintiff is also qualified to receive hospital and medical services from Defendant, in that she met the essential eligibility requirements for the receipt of such services.  45 C.F.R. § 84.3(e)(4).

133.    Defendant's services, operations and program are "program[s] or activit[ies] within the meaning of 29 U.S.C. § 794(b)(3)(A)(ii).

134.    At all relevant times Defendant was a recipient of federal financial assistance within the meaning of the Rehab Act, in the form of Medicare and Medicaid payments, among other federal funds.  29 U.S.C. § 794(a).

135.    Defendant employs 15 or more persons, and the Rehab Act requires that such recipient shall provide appropriate auxiliary aids to persons with impaired sensory or speaking skills where necessary to afford an equal opportunity to benefit from the service.  45 C.F.R. § 84.52(d)(1).

136.    Appropriate auxiliary aids include, but are not limited to, ASL interpreters.  45 C.F.R. § 84.52(d)(3).

137.    Despite repeated requests to Defendant from Ms. Brown for auxiliary aids and services, Defendant refused to provide the auxiliary aids and services needed for effective communication with Ms. Brown.

138.    As such, Defendant discriminated against Plaintiff by denying her participation in the full benefits of the services, programs, and activities, i.e. health care services, offered by Defendant.  29 U.S.C. § 794; 45 C.F.R. § 84.52(d).

139.    Defendant discriminated against Plaintiff by providing its benefits and services in a manner that was not equal to, or not as effective as, that offered to hearing persons.  29 U.S.C. § 794; 45 C.F.R. § 84.52(a)(2) and (3).

140.    Defendant acted intentionally or with deliberate indifference to the rights of Plaintiff when it failed to provide qualified sign language interpreters for communications with Ms. Brown during the relevant time periods of each Plaintiff's experiences at Defendant as described above.  Therefore, Defendant's actions and failures to act, which violated the Rehab Act, entitle Plaintiff to recovery compensatory damages.

141.    As a result of Defendant's actions and its failures to act, Plaintiff suffered the harm described in this Amended Complaint.

## THIRD CAUSE OF ACTION
## VIOLATION OF CHAPTER 121 OF THE TEXAS HUMAN RESOURCES CODE

142.    Plaintiff re-alleges Paragraphs 1–141 of this Amended Complaint and incorporate their contents into this Cause of Action by reference.

143.    By statute, it is the policy of the State of Texas "to encourage and enable persons with disabilities to participate fully in the social and economic life of the state, to achieve maximum personal independence, to become gainfully employed, and to otherwise fully enjoy and use all public facilities available within the state."  TEX HUM. RES. CODE § 121.001.

144.    The term "public facilities" includes "a building to which the general public is invited…and any other place of public accommodation…to which the general public or any classification of persons from the general public is regularly, normally, or customarily invited."

TEX. HUM. RES. CODE § 121.00(1)(5).  The Defendant falls within the Code's definition of "public facility."

145.    Plaintiff is an individual with a disability within the Texas Human Resources Code in that she is an individual who is deaf.  *Id.* § 121.002(4).

146.    Based on its conduct described above, Defendant has violated Chapter 121 in the following ways:

> a.  Denying Plaintiff the full use and enjoyment of facilities offered to those without disabilities, in violation of § 121.003(a).
>
> b.  Failing to make reasonable accommodations in their policies, practices, and procedures so that the Plaintiff would have effective communication, and thus be able to have full use or access to Defendant's medical services in violation of § 121.003(d)(2).
>
> c.  Failing to provide Plaintiff with auxiliary aids and services for effective communication so she would have full use and enjoyment of Defendant's medical services, in violation of § 121.003(d)(3).

147.    A person, firm, association, corporation, or other organization, or the agent of a person, firm, association, corporation, or other organization who violates § 121.003 is deemed to have deprived a person with a disability of his civil liberties.  *Id.* § 121.004(b).

148.    A person with a disability, deprived of his civil liberties, may maintain a cause of action for damages in a court of competent jurisdiction.  *Id.*

149.    Therefore, Defendant discriminated against Plaintiff Brown on the basis of her disability and deprived her of her civil liberty, and entitled Plaintiff Brown to recover compensatory damages.

EXHIBIT A

## RELIEF REQUESTED

Plaintiff prays for relief as follows:

1.    Immediate injunctive relief under federal and state law for Defendant to provide onsite certified ASL interpreters for Plaintiff Brown to communicate with care providers at any and all of J.R.H.'s prescheduled appointments, emergency visits, and procedures for the duration of his treatment and care for leukemia;

2.    Immediate, preliminary and permanent injunctive relief under federal and state law prohibiting Defendant from requiring 24-hour notice before it will attempt to contact ASL interpreters for Ms. Brown's communication access at Defendant.

3.    Immediate preliminary and permanent injunctive relief under federal and state law for Defendant to provide onsite certified ASL interpreters for Plaintiff Brown to communicate with care providers at any and all of childrens' and Mr. Howe's medical appointments and visits at Defendant.

4.    Immediate, preliminary and permanent injunctive relief under federal and state law prohibiting Defendant from continuing its discriminatory denial of Plaintiff's communication access to its medical services and affirmatively requiring Defendant to remove any barriers to access to its services; and allowing Plaintiff to participate in its programs on a basis equal to other persons and companions;

5.    Statutory, compensatory and punitive damages under federal and state law;

6.    Interest on compensatory damages at the legal rate from the first date of injury;

7.    Attorney's fees and litigation costs and expenses under federal law; and

8.    Such other and further relief as may be deemed just, equitable and appropriate by the Court.

EXHIBIT A

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial in this action for all claims so triable.

**Date:** October 4, 2019

Respectfully submitted,

  /s/ Heather M. Gilbert
HEATHER M. GILBERT
*Admitted Pro Hac Vice*
Minnesota State Bar No. 392838
GILBERT LAW PLLC
4856 Banning Avenue
St. Paul, MN 55110
(651) 340-9642 (phone)
(651) 344-0835 (fax)
Email: heather@gilbertlawpllc.com

LIA S. DAVIS
State Bar No. 24071411
DISABILITY RIGHTS TEXAS
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 454-4816 (phone)
(512) 454-3999 (fax)
Email: ldavis@drtx.org

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of October, 2019, a true and correct copy of the foregoing document was electronically filed using the Court's CM/ECF filing system, thus providing notice of electronic filing to counsel of record.

  /s/ *Heather M. Gilbert*
HEATHER M. GILBERT